UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MADELYN B. BARNES, etc.,

Plaintiff,

v.

HEALTHNOW NEW YORK INC., D/B/A BLUECROSS BLUESHIELD OF WESTERN NEW YORK, AND D/B/A BLUESHIELD OF NORTHEASTERN NEW YORK, NOW KNOWN AS HIGHMARK WESTERN AND NORTHEASTERN NEW YORK INC.,

Defendant.

Case No.: 16-cv-0088-JLS

---

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTIONS TO THE REPORT AND RECOMMENDATION DENYING PARTS OF ITS SUMMARY JUDGMENT MOTION AND MOTION FOR LEAVE TO FILE SUPPLEMENT TO RECORD**

Respectfully submitted,

PHILLIPS LYTLE LLP
Attorneys for Defendant
*HealthNow New York Inc. etc.*

Alan J. Bozer, Esq.
William P. Keefer, Esq.
Erin C. Borek, Esq.
Ling Yao, Esq.
– Of Counsel –

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STATEMENT OF FACTS ........ 2

SUMMARY OF THE REPORT ........ 5

ARGUMENT ........ 6

POINT I THE REPORT ERRED IN ITS APPLICATION OF LAW CONCERNING THE PUBLIC DISCLOSURE BAR AND HOLDING HEALTHNOW TO A HIGHER STANDARD THAN APPROPRIATE ........ 6

A. Legislative History Demonstrates Congressional Efforts to Stifle Parasitic Lawsuits, Including Those Where Government Already Can Act Based Upon Publicly Disclosed Information. 6

B. The OPM Audits Trigger the Public Disclosure Bar Because the Disclosed Transactions Create an Inference of Impropriety and Were Sufficient For The Government to Investigate, and To Make A Decision on Whether To Prosecute Its Own Case. ........ 11

1. The OPM Audits trigger the public disclosure bar because
the disclosed transaction creates an inference of impropriety. ........ 11

2. The OPM Audits trigger the public disclosure bar because they revealed sufficient information for the government adequately to investigate the case and to make a decision on whether to prosecute. ........ 13

POINT II THE REPORT ERRED IN NOT FINDING THAT PLAINTIFF'S CASE MUST BE BARRED BECAUSE IT IS SUBSTANTIALLY THE SAME AS THE OPM AUDITS ........ 14

A. OPM Audited the Same Overcharges as in Relator Claims ........ 15

B. It Was Error to Disregard the Affidavits of Witnesses with Knowledge ........ 17

C. It was Error to Find that the OPM Audits and Conclusions Are Not Material ......18

POINT III THE REPORT ERRED IN DENYING THE MOTION FOR LEAVE TO FILE SUPPLEMENT TO RECORD AND NOT STRIKING THE RELATOR'S AFFIDAVIT ......18

CONCLUSION ......20

# TABLE OF AUTHORITIES

Page

**Cases**

*Atkinson v. PA. Shipbuilding Co.*,
473 F.3d 506 (3d Cir. 2007) ........................................11

*Chen v. EMSL Analytical, Inc.*,
966 F. Supp. 2d 282 (S.D.N.Y. 2013)........................................13, 14

*Crandon v. United States*,
494 U.S. 152 (1990)........................................6

*Davis v. District of Columbia*,
591 F. Supp. 2d 30 (D.D.C. 2008) ........................................13

*Davis v. District of Columbia*,
679 F.3d 832 (D.C. Cir. 2012) ........................................12, 13

*Dick v. Long Island Lighting Co.*,
912 F.2d 13 (2d Cir. 1990)........................................6

*Findley v. FPC-Boron Employees' Club*,
105 F.3d 675 (D.C. Cir. 1997) ........................................8, 10, 13

*Graham Cnty. Soil & Water Conservation Dist. v. Wilson*,
559 U.S. 280 (2010)........................................7, 8, 9

*Hellstrom v U.S. Dept. of Veterans Affairs*,
201 F3d 94 (2d Cir. 2000)........................................17

*Joseph v. Cannon*,
642 F.2d 1373 (D.C. Cir. 1981)........................................13

*Kirk v. Schindler Elevator Corp.*,
437 F. App'x 13 (2d Cir. 2011) ........................................11

*Marcus v. Hess*,
317 U.S. 537 (1943)........................................7

*Mateski v. Raytheon Co.*,
816 F.3d 565 (9th Cir. 2016)........................................9

*May v. Purdue Pharma L.P.*,
737 F.3d 908 (4th Cir. 2013)........................................9

*Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
812 F.3d 294 (3d Cir. 2016) ............................................................................8, 9

*Oliver v. Philip Morris USA Inc.*,
826 F.3d 466 (D.C. Cir. 2016) ............................................................................ 7

*Patterson v. County of Oneida*,
N.Y., 375 F.3d 206 (2d Cir. 2004)........................................................................19

*Pettis v. Morrison–Knudsen Co., Inc.*,
577 F.2d 668 (9th Cir. 1978) ...............................................................................13

*Piacentile, etc v. U.S. Oncology, Inc., etc.*,
2023 WL 2661579 (2d Cir. Mar. 28, 2023) ........................................................... 9

*Rockwell Int'l Corp. v. United States*,
549 U.S. 457 (2007)............................................................................................ 8

*Schindler Elevator Corp. v. Kirk*,
563 U.S. 401 (2011)........................................................................................9, 10

*Silbersher v. Valeant Pharms. Int'l, Inc.*,
445 F. Supp. 3d 393 (N.D. Cal. 2020) ................................................................. 9

*Springfield Terminal Ry. Co. v. Quinn*,
14 F.3d 645 (D.C. Cir. 1994) ....................................................................... 7, 8, 10

*Tackman v. Goord*,
No. 99–CV–0438A(F), 2005 WL 2347111 (W.D.N.Y. Sept. 26, 2005).........................19

*Torrel v. City of New York*,
114 F. App'x 14 (2d Cir. 2004) ............................................................................19

*United States v. Am. Trucking Ass'ns*,
310 U.S. 534 (1940)............................................................................................ 6

*United States v. New York City Health & Hosp. Corp.*,
2000 WL 1610802, at *6 (S.D.N.Y. Oct. 27, 2000), *aff'd sub nom*........................... 12, 13

*United States v. New York Med. Coll.*,
252 F.3d 118 (2d Cir. 2001) ................................................................................12

*Universal Health Servs. v. United States ex rel. Escobar*,
579 U.S. 176 (2016)...........................................................................................18

*Weinberger v. Florida*,
615 F.2d 1370 (5th Cir. 1980) .............................................................................13

*Winslow v. PepsiCo, Inc.*,
2007 WL 1584197 (S.D.N.Y. May 31, 2007) ....................................................12

*Wisconsin v. Dean*,
729 F.2d 1100 (7th Cir.1984) ....................................................................8, 13

**Statutes**

28 U.S.C. § 636(b)(1)(C) ...........................................................................15

Act of Dec. 23, 1943, 57 Stat. 609 (codified at 31 U.S.C. § 232(C) (1946 ed.))
(False Claims Act (FCA))..........................................................................*passim*

**Other Authorities**

89 CONG.REC. 510,744 (daily ed. Dec. 16, 1943) ............................................ 7

FRCP Rule 56 ..............................................................................................19

HMSA Provider Resource Center,
https://prc.hmsa.com/s/article/Diagnosis-Related-Group-DRG#:~:text=A%20diagnosis
%2Drelated%20group%20(DRG,and%20encourages%20cost%20contain
ment%20initiatives. (last accessed on April 4, 2023) ....................................3, 4

https://www.opm.gov/ our-inspector-general/publications/report .................................. 2

# INTRODUCTION

Defendant HealthNow New York, Inc., n/k/a Highmark Western and Northeastern New York, Inc. ("HealthNow") respectfully submits this memorandum in support of its objections to the denial of parts of its Motion for Partial Summary Judgment. Dkt. 86. The Report, Recommendation and Order by Magistrate Judge Schroeder, Dkt. 113 (the "Report"), erred in its application of the public disclosure bar, and refused to receive or disregarded important evidence as to the similarity of the audits that foreshadowed the Relator's allegations.

HealthNow also objects to the denial of its Motion for Leave to File Supplement to Record. Dkt. 109. That motion should have been granted because it offered by way of Relator's admissions that she lacked familiarity with essential facts involving the Federal Employee Program ("FEP") and the Audit Notices, and showed that she is not competent to offer evidence opposing the motion.

The papers before the Court show that the United States Office of Personnel Management (OPM), which manages the FEP, regularly audits payments to providers by participating plans like HealthNow. In particular, OPM audits whether HealthNow or other plans have paid more than what providers charge for their services. The Relator's case is barred because, in mimicry to the OPM audits, she complains that HealthNow, from time to time, paid more than the providers' charges for service, which is exactly what the audits looked for.

The Relator simply repeats what the Government already knows and monitors. Accordingly, the counts alleging that HealthNow paid more to providers than they charged should be dismissed.

## STATEMENT OF FACTS

HealthNow is a member of the national Blue Cross Blue Shield Association (the "BCBS Association"), a leading consumer health care insurance brand in the country. The BCBS Association plans have been serving the health care insurance needs of its members' communities for over 80 years, with services in all 50 states.

The FEP is a program established by federal law for which OPM secures healthcare coverage for federal employees. OPM has an agreement with the BCBS Association to provide healthcare services. In turn, the BCBS Association coordinates and provides benefits through individual BlueCross BlueShield plans across the country. HealthNow is one of those plans. Report, p. 2.

OPM audits HealthNow and other Blue Cross Blue Shield plans on a regular basis. It publishes these federal audits on its public site. *See* https://www.opm.gov/our-inspector-general/publications/reports. OPM commenced an audit in 2010 of claims paid under the FEP where the amount paid exceeded covered charges of providers (the "2011 OPM Audit"). Report, pp. 2-3. "A final report was issued on January 31, 2011 (the '2011 Audit Report') summarizing the 2011 OPM Audit's findings." Report, p. 3 (citation omitted). "The 2011 Audit Report states that the 2011 OPM Audit's purpose 'was to determine whether BCBS plans properly charged the FEHBP for claims where the amounts paid exceeded covered charges.' " *Id.*

Defined terms are not always consistent in the filed papers. As explained in the record:

"Allowed Rate" refers to the amounts negotiated in contracts between HealthNow and providers, such as hospitals. *See* affidavits of Kim King (Dkt. 99-7), and Lisa Burke (Dkts. 86-1 and 99-8).

"Covered Charge" is a term used in the OPM Audits and refers to what a provider such as a hospital would charge for a service in the absence of a negotiated Allowed Rate; it is sometimes referred to as a "Provider Charge," *id.*, or as "Billed Charges" or "Billed Amount" in the Relator's papers. The Report, p. 3, found that "[t]he 2011 and 2013 OPM Audits (together, the "OPM Audits") do not expressly define 'covered charges.' "

"Claim Amount Paid" is referenced in the 2011 Audit and is the applicable "Allowed Rate" or "Covered Charge," minus deductions for co-pays, deductibles, co-insurance, etc. *see, e.g.*, Dkt. 99-7, p.3, *i.e.* the amount actually paid by HealthNow to the hospital or other provider.

"APG" is defined in the 2011 OPM Audit to be any instance where the Claim Amount Paid exceeds the Covered Charges. *Id.*

The 2011 Final Report, published on January 11, 2011, detailed OPM's findings and the errors and overcharges it uncovered:

> These errors were due to the [BCBS] plans using the incorrect per diems, diagnosis related grouping rates, or percent of charges when pricing the claims, or ***not applying the lesser of billed charges.*** (emphasis supplied)[1]

---

[1] Paying more than Covered Charges could happen for any number of reasons. For example, where Diagnostic Related Group ("DRGs") rates covered a particular admission (*e.g.,* knee replacement), the actual provider charges for the admission could be less than the DRG. DRGs encourage providers to keep their costs low and to operate efficiently. A DRG "is a patient classification system that standardizes prospective payment to hospitals and encourages cost containment initiatives." *See* HMSA Provider Resource Center, https://prc.hmsa.com/s/article/Diagnosis-Related-Group-DRG#:~:text=A%20diagnosis

Moreover, the OPM Audits -- unlike Relator's audit -- involved the actual review of FEP claims, as well as the underlying provider contracts, and determinations concerning whether payments in excess of Covered Charges were appropriate or not.

The Relator alleges in her Third Amended Complaint, Dkt. 99-2 (the "Complaint") that HealthNow had agreements with hospitals and other providers to allow it to pay the Covered Charge if it was less than the Allowed Rate. Report, pp. 3-4 (the actual language is set forth at the Complaint, ¶ 21).[2]

Since the OPM Audits did not result in any negative adjustments to claims HealthNow's paid, there was no issue for HealthNow to be aware of prior to Relator's audit, and there is no inconsistency with HealthNow arguing that it was not aware of a material issue concerning FEP overpayments prior to Relator's audit. Moreover, Relator's audit did not identify any material FEP overpayments, because as Relator now concedes, she never audited overpayments actually recoverable by the government. Moreover, the 2011 Audit Report specifically reviewed instances where plans were "not applying the lesser of billed charges." Dkt. 86-5, p. 10 (first bullet point).

---

%2Drelated%20group%20(DRG,and%20encourages%20cost%20containment%20initiatives. (last accessed on April 4, 2023). "In general, a DRG payment covers all charges associated with an inpatient stay from the time of admission to discharge." *Id.* "DRG payment is based on the care given to and resources used by a 'typical' patient within the group." *Id.* Generally, when the cost of treatment a specific patient is higher or lower than typical, the provider will be paid the same DRG payment, meaning it receives more or less than its actual costs.

[2] The "lesser of" language offered by the Relator is as follows:

> In the event any rates set forth herein [*i.e.* the allowed rate] are greater than hospital's charges for the item, service or admission [*i.e.* the covered charges], health plan and/or self-insures, as applicable, shall remit the charged the amount to hospital, less any cost-sharing amounts.

The 2011 Audit Report included schedules showing that HealthNow (identified as "BCBS of Western New York") was audited, responded to the audit, and was found to be in compliance with FEP requirements including those instances in which it was "not applying the lesser of billed charges." *Id.* at p. 16.

Relator offered no evidence demonstrating overpayment by the government under the FEP plan (or any other government plan). *See* Relator Aff., Dkt 48-1, p. 10, ¶ 38. Since the federal government had knowledge through its OPM Audits that BCBS plans, including HealthNow, sometimes paid more than Covered Charges, and since the information from those audits was published and available to the public, Relator provided no new information. Her claims should be dismissed.

**SUMMARY OF THE REPORT**

The Report held that the OPM audits did not focus on "fraud" involving HealthNow, and therefore did not qualify as barring Relator's case under the public disclosure rule. In other words, since the government only looked at the improprieties of billings where the Claim Amount Paid was greater than the Covered Charge, and not for specific instances of fraud, that HealthNow's motion to dismiss claims involving the FEP could not be granted.

The Report recommended that the majority of the Motion for Partial Summary Judgment be denied "because there are issues of fact pertaining to the scope and content of the OPM Audits." Report, p. 6. This was so because the OPM Audits, the Report holds, did not define important terms.

The Report did not receive or disregarded the affidavits offered by HealthNow that explained the important terms (*e.g.*, the meaning of "Covered

Charges") and addressed the audit procedures because the Relator needed to have discovery. Report, p. 10-11.

The Report held that the record could not be supplemented with the Relator's admissions, including evidence of her incompetency to give evidence concerning the FEP claims, because the Relator has not had an opportunity for discovery.

HealthNow objects to the foregoing findings in the Report.[3]

## ARGUMENT

## POINT I

### THE REPORT ERRED IN ITS APPLICATION OF LAW CONCERNING THE PUBLIC DISCLOSURE BAR AND HOLDING HEALTHNOW TO A HIGHER STANDARD THAN APPROPRIATE

### A. Legislative History Demonstrates Congressional Efforts to Stifle Parasitic Lawsuits, Including Those Where Government Already Can Act Based Upon Publicly Disclosed Information.

A court's fundamental task in interpreting the False Claims Act (FCA) is "to give effect to the intent of Congress." *Dick v. Long Island Lighting Co.*, 912 F.2d 13, 17 (2d Cir. 1990) (quoting *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940)). "In determining the meaning of the statute, [courts] look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon v. United States*, 494 U.S. 152, 158 (1990). "The history of the FCA *qui tam* provisions demonstrates repeated congressional efforts to walk a fine line between encouraging whistle-

[3] The Report granted that part of HealthNow's motion seeking to dismiss claims for damages on behalf of any local government. Report, p. 11. HealthNow does not object to that part of the Report.

blowing and discouraging opportunistic behavior." *Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994). The public disclosure bar "must be analyzed in the context of these twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own." *Id.*; *see also Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 475 (D.C. Cir. 2016).

As originally enacted, the FCA did not limit the sources from which a relator could acquire the information to bring a *qui tam* action. *Graham Cnty. Soil & Water Conservation Dist. v. Wilson*, 559 U.S. 280, 293-94 (2010). Overly generous provisions, however, present the danger of parasitic exploitation of the public coffers, as exemplified by the notorious plaintiff who discovered fraud by reading a federal criminal indictment in *Marcus v. Hess*, 317 U.S. 537 (1943). *Hess* "inspired public outcry over the liberality of the *qui tam* provisions" that prompted speedy amendment. *Springfield*, 14 F.3d at 650.

In 1943, Congress erected what came to be known as a Government knowledge bar: "[O]nce the United States learned of a false claim, only the Government could assert its rights under the FCA against the false claimant." *Graham*, 559 U.S. at 294; *see* Act of Dec. 23, 1943, 57 Stat. 609 (codified at 31 U.S.C. § 232(C) (1946 ed.)). The amendments were the product of careful compromise: the House bill would have repealed the *qui tam* provisions altogether, while the Senate bill barred *qui tam* jurisdiction for suits based on information already in possession of the government unless the information was "original with such person." *Springfield*, 14 F.3d at 650; *see* 89 CONG.REC. 510,744 (daily ed. Dec. 16, 1943). The Senate's original source provision, however, was dropped in conference without explanation. *Id.*

"The volume and efficacy of *qui tam* litigation dwindled" in the following years. *Graham*, 559 U.S. at 294. "Once again, the passage of time revealed that Congress, in its attempt to evade Scylla, had steered precipitously close to Charybdis." *Springfield*, 14 F.3d at 650. In *Wisconsin v. Dean*, 729 F.2d 1100 (7th Cir.1984), "the nadir of the *qui tam* action," the court dismissed the State of Wisconsin's *qui tam* action alleging Medicaid fraud that the state's own investigation had uncovered, because the state had already reported the fraud to the federal government. *Id*. at 1103-06.

After "ricocheting between the extreme permissiveness that preceded the 1943 amendments and the extreme restrictiveness that followed," Congress overhauled the statute in 1986 by choosing a third path in between, which evolved into the public disclosure bar. *Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 680 (D.C. Cir. 1997), abrogated on other grounds by *Rockwell Int'l Corp. v. United States*, 549 U.S. 457 (2007). On the one hand, Congress clearly acted upon its expressed intention to "encourage more private enforcement suits" by enacting the original-source exception. *See* S. Rep. No. 99-345, pp. 23-24 (1986). On the other hand, Congress left in place barriers to parasitic lawsuits, including "situations in which the relator's complaint repeats what the public already knows, even though she had learned about the fraud independent of the public disclosures." *Findley*, 105 F.3d at 683.

Congress amended the public disclosure bar in 2010 by removing the "jurisdiction" language, reducing the number of enumerated public disclosure sources, and expanding the definition of "original source" by allowing a relator who "materially adds" to the publicly disclosed information to qualify. *Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 297 (3d Cir. 2016). "Although no direct legislative history seems to

exist," some circuit courts have inferred from the textual changes "Congress's intent to lower the bar for relators." *Id.* at 299; *see May v. Purdue Pharma L.P.*, 737 F.3d 908, 917 (4th Cir. 2013).

But the 2010 amendments were not a flat-out rejection of the principle that *qui tam* suits should be barred where "the Government was on notice to investigate the fraud before the relator filed his complaint." *Mateski v. Raytheon Co.*, 816 F.3d 565, 574 (9th Cir. 2016); *see also Schindler Elevator Corp. v. Kirk*, 563 U.S. 401, 410 (2011). It is still the case that the "public disclosure bar is intended to encourage suits by whistle-blowers with genuinely valuable information, while discouraging litigation by plaintiffs who have no significant information of their own to contribute." *Mateski*, 816 F.3d at 570.

While amendments to the FCA may have been enacted to strengthen the Government's hand in fighting false claims and to encourage more private enforcement suits, "[i]t is equally beyond cavil [ ] that Congress passed the public disclosure bar to bar a subset of those suits that it deemed unmeritorious or downright harmful." *Graham*, 559 U.S. at 298. "In enacting the public disclosure bar, Congress sought to 'strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits,' such as those in which a relator discovers the fraud through public information on which the government already can act." *Piacentile, etc v. U.S. Oncology, Inc., etc.*, 2023 WL 2661579, at *1 (2d Cir. Mar. 28, 2023). "The basic idea [of the public disclosure bar] is that if the government already had notice to investigate the potential fraud, a private action would be 'parasitic,' and should not be rewarded." *Silbersher v. Valeant Pharms. Int'l, Inc.*, 445 F. Supp. 3d 393, 401 (N.D. Cal. 2020).

"The blocking of freeloading relators who copy their complaints directly from public disclosures is not the FCA's only concern." *Findley*, 105 F.3d at 685. Once the information is in the public domain and Government has had a chance to examine the underlying transaction, there is less need for a financial incentive to spur individuals into repeating the work. *Id*. Although "Congress did not prescribe by mathematical formulae the quantum or centrality of nonpublic information that must be in the hands of the *qui tam* relator in order for suits to proceed," it is a court's task to ensure that "*qui tam* suits are limited to those in which the relator has contributed significant independent information." *Id*. at 686; *Springfield*, 14 F.3d at 653; *see also Kirk*, 563 U.S. at 413 (finding a *qui tam* action brought by defendant's former employee "a classic example of the 'opportunistic' litigation that the public disclosure bar is designed to discourage" although the former employee "allege[d] that he became suspicious from his own experiences" working at defendant company).

Here, the Relator's Complaint presents another classic example of what is barred under the public disclosure rule. Before the Relator filed her Complaint, the Government was already on the track of investigating the overpayment issue. And indeed, the Government investigated the overpayments by more than one audit and closely examined each incident where it appeared that plans were "not applying the lesser of billed charges." *See* 2011 Audit Report, Dkt. 86-5, p. 10. Thus, the Government was capable of taking further actions or pursuing a fraud action against the Defendant if it chose to. Satisfied with the information discovered through the OPM Audits, the Government chose not to punish HealthNow. Therefore, the Relator's suit alleging FEP overpayments is parasitic and should be dismissed.

**B. The OPM Audits Trigger the Public Disclosure Bar Because the Disclosed Transactions Create an Inference of Impropriety and Were Sufficient For The Government to Investigate, and To Make A Decision on Whether To Prosecute Its Own Case.**

The Report, p. 11, suggests that the public disclosure bar does not apply because "HealthNow has not even attempted to argue that the OPM Audits revealed any information regarding the fraudulent nature of any of the alleged overpayments." Because the OPM Audits considered the overpayments "good faith erroneous benefit payments," the Report finds that "there is no evidence on the record indicating that the OPM Audits 'suggest[ed], infer[ed] or accuse[d]' HealthNow of 'intentionally or fraudulently creating the discrepancies' in payments, which is an essential element of Barnes 'claims." Report, p. 12.

Contrary to the holding of the Report, it is not necessary for a public disclosure to identify fraud in the defendant's act. Rather, it is sufficient to trigger the public disclosure bar that the disclosed transaction creates an inference of impropriety. Here, the OPM Audits have revealed sufficient information for the government to adequately investigate the case and to make a decision on whether to pursue relief based on contractual improprieties.

**1. The OPM Audits trigger the public disclosure bar because the disclosed transaction creates an inference of impropriety.**

As recognized by the Second Circuit, "it is sufficient for the public disclosure bar that the disclosed transaction 'creates an inference of impropriety.'" *Kirk v. Schindler Elevator Corp.*, 437 F. App'x 13, 17 (2d Cir. 2011) (finding that plaintiff's claims could be dismissed even though defendant was not accused of fraud in public disclosure); *see also Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506, 519-30 (3d Cir. 2007) (dismissing plaintiff's FCA action in its entirety under the public disclosure bar without examining whether an

audit accused defendant of fraud, so long as both a misrepresentation and a true state of facts were disclosed publicly).

For example, in *United States v. New York City Health & Hosp. Corp.*, 2000 WL 1610802, at *6 (S.D.N.Y. Oct. 27, 2000), *aff'd sub nom. United States v. New York Med. Coll.*, 252 F.3d 118 (2d Cir. 2001), the court dismissed a *qui tam* action under the public disclosure bar where an audit had revealed $2 million of overcharge. In this case, former employees of a hospital filed a *qui tam* complaint under the FCA alleging medicare and medicaid fraud. *Id.* at *1. Prior to the case filing, an audit was done and identified the overcharge. *Id.* at *2. Even though the audit did not accuse the defendants of fraud, it triggered the public disclosure bar and was interpreted to contain sufficient "allegations or suggestions of fraud that were accessible to the public." *Id.* at *4; *see Winslow v. PepsiCo, Inc.,* 2007 WL 1584197, at *6 (S.D.N.Y. May 31, 2007).

Likewise, in *Davis v. District of Columbia*, 679 F.3d 832, 835-39 (D.C. Cir. 2012), the court found that an audit report triggered the public disclosure bar when it revealed the heart of a relator's FCA claim. In *Davis*, a relator filed a *qui tam* action alleging that the District of Columbia and its schools submitted a Medicaid reimbursement claim without maintaining adequate supporting documentation. *Id.* at 834. Prior to the action, an auditor released to the public a report revealing that "$15 million of costs incurred for services rendered to special education students [by the defendant] were disallowed for Medicaid reimbursement due to the absence or unavailability of supporting documentation," and that "documentation of services" had to be "immediately improved." *Id.* at 835. The court found that the audit report "publicly disclosed the heart of plaintiff's FCA claim," *i.e.*, "that defendants submitted claims for reimbursement without maintaining

supporting documentation." *Davis v. District of Columbia*, 591 F. Supp. 2d 30, 36 (D.D.C. 2008). Even though the auditor's report did not accuse the defendant of fraud, the court found it "revealed to the public the 'allegation' [of improprieties] and provided ample reason for the government to investigate further," and thus triggered the public disclosure bar. *Davis*, 679 F.3d. at 835-39.

Here, the OPM Audits reveal the heart of the Relator's FCA claim -- that HealthNow overcharged the FEP because of negligent coding that failed to apply the contractual "lesser of" language. Complaint, ¶ 26. In particular, the 2011 Audit Report addressed payments made by BCBS plans using negotiated rates to providers even though charges by the providers were less than the negotiated rates. *See* 2011 Audit Report, Dkt. 86-5, p. 3. Similar to *Davis* and *New York City Health & Hosp.*, audits in this case revealed to the public the allegation or suggestions that HealthNow overcharged the Government. At the very least, the disclosed transaction creates an inference of impropriety as alleged by the Relator in this *qui tam* case.

**2. The OPM Audits trigger the public disclosure bar because they revealed sufficient information for the government adequately to investigate the case and to make a decision on whether to prosecute.**

It is widely recognized that the public disclosure bar is triggered whenever "the evidence and information in the possession of the United States at the time the [FCA] suit was brought was sufficient to enable it adequately to investigate the case and to make a decision whether to prosecute." *Chen v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 298 (S.D.N.Y. 2013); *see Findley*, 105 F.3d at 684; *Wisconsin*, 729 F.2d at 1103-04, superseded by statute on other grounds; *Joseph v. Cannon*, 642 F.2d 1373, 1377 (D.C. Cir. 1981); *Weinberger v. Florida*, 615 F.2d 1370, 1371 (5th Cir. 1980); *Pettis v. Morrison–Knudsen Co., Inc.*, 577 F.2d

668, 674 (9th Cir. 1978). "The question, properly, then, is whether the information conveyed [to the Government] could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing." *Chen*, 966 F. Supp. 2d at 298.

Here, HealthNow provides healthcare coverage in a highly-regulated industry and has been regularly audited for FEP payments to providers, including in the years just preceding and following the commencement of this case. It is simply not plausible that Government officials conducting the audits and looking into the overpayments were not alerted by the information uncovered during the audits to the prospect of HealthNow's alleged wrongdoing, *i.e.* overpayments to providers. Indeed, the OPM Audits detailed the specific review of instances where plans appeared to be "not applying the lesser of billed charges." *See* 2011 Audit Report, Dkt. 86-5, p. 10. The information was sufficient for the government to adequately investigate the "fraudulent acts" alleged by the Relator. The fact that the Government found the overpayments to be "good faith erroneous benefit payments within the context of [the contract]", and chose not to prosecute its own case, should not be interpreted against HealthNow. *Id.*, p. 11; 2013 Audit Report, Dkt. 86-6, p. 13.

## POINT II

### THE REPORT ERRED IN NOT FINDING THAT PLAINTIFF'S CASE MUST BE BARRED BECAUSE IT IS SUBSTANTIALLY THE SAME AS THE OPM AUDITS

HealthNow moved early for summary judgment on the audit issue because public disclosure should be interpreted as a "bar" to lawsuits, not as a "defense" to be invoked after issue has been joined. This is especially so in the healthcare industry, which is

heavily regulated by the Government. Healthcare costs are an universal financial concern.[4] Moreover, allowing inquiries into reams of HIPAA-protected patient medical data is a recipe for mischief, and not necessarily of an intentional sort.

The OPM Audit documents placed before the Court speak for themselves. Those audits scrutinized HealthNow and others looking for payments that exceeded "Covered Charges." Moreover, OPM's remedial actions when it located those contract improprieties, whether as a result of coding errors (as with HealthNow) or otherwise, shows that the Government does not regard these FEP overpayments as material.

**A. OPM Audited the Same Overcharges as in Relator Claims**

The Report, p. 9, acknowledges that OPM recognized "the impact of coding accuracy in the payment process." The Complaint similarly alleges at ¶ 26 that HealthNow's processing software was improperly "configured" and, as a result, it was in some instances paying more than Covered Charges.

The face of the Audit directions evidence that the Government knew of and was on the track of these overpayments. The Report erred in determining that the 2011 Audit Report had ambiguities about the scope of OPM's audit. Report, p. 8.

Because the District Court reviews the Report on a *de novo* basis, 28 U.S.C. § 636(b)(1)(C), HealthNow objects to the Report's factual conclusion that the OPM Audits did not cover "the same kind of erroneous payments alleged in the Third Amended Complaint." Report, p. 9. To the contrary, the 2011 OPM Audit identified "net overcharges [resulting from] not applying the lesser of billed charges." *Id.*; Dkt. 86-5, p. 7,

---

[4] The Court may take judicial notice of the recent financial problems, bankruptcies and closings of regional medical centers such as Eastern Niagara (Lockport, NY) and Lakeshore Hospital (Irving/Silver Creek, NY).

which are similar if not identical to the Relator's allegations that HealthNow, on occasion, paid Allowed Rates that exceeded Covered Charges where the "lesser of" language applied.

The Report reflects that the Magistrate was unpersuaded that "billed charges" are the same as "Covered Charges" such as HealthNow was paying. Report, p. 10. Inasmuch as the Audit was dealing with payments by providers to HealthNow and other plans, the only explanation for "billed charges" (*i.e.* covered charges) could only refer to the hospital's charges. HealthNow did not charge anything that was being reviewed.

The Report held also that while the 2011 Audit Report referenced errors due to the non-application of "the lesser of billed charges," those references were "insufficient to indisputably outline the scope of the OPM Audits and the extent of their findings regarding Barnes' specific type of alleged overpayments." Report, p. 10. However, this language is entirely consistent with the purpose of the OPM Audits stated at the Report p. 3 ("to determine whether BSBS plans properly charged the FEHBP for claims where the amounts paid exceeded Covered Charges").

The Report properly notes that "a purported public disclosure must expose all the essential elements of the alleged fraud," Report, p. 11 (citation omitted), but came to a mistaken conclusion that somehow the Relator's claims in the Complaint were "not substantially similar." *Id*. The Report focused on a need "to outline *fraudulent* conduct, *id*. (citation omitted), but that promotes Relator's allegations to a higher standard than OPM applied in doing its audit. The OPM Audit dealt with facts, while Relator's allegations of fraud are conclusions that may be drawn, or not. OPM never referred to these contractual improprieties as "fraud," but it conducted the audits methodically and diligently and leaves it open for conclusions to be drawn accordingly. Through the OPM Audits, the

Government investigated the same set of facts based on which the Relator is now bringing her claims, closely examined the over-paid amounts (suspected misrepresented facts) and the correct amounts (true facts upon verification) but determined that no fraud was involved with FEP overcharges - they were merely contractual improprieties.

The Relator does not further the Government's interest by labeling the same overcharges to be fraud and her FEP allegations should be dismissed.

**B. It Was Error to Disregard the Affidavits of Witnesses with Knowledge**

The Report observes that "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." Report, p. 15 (citing *Hellstrom v U.S. Dept. of Veterans Affairs*, 201 F3d 94, 97 (2d Cir. 2000)). And it states more than once the need to "disambiguate[] the terms used in the 2011 OPM Audit. *Id.*, pp. 9, 17.

As stated above, the OPM Audits create no ambiguity when they refer to "Covered Charges" or "Billed Charges." These terms refer to the amounts charged by the providers with which HealthNow was contractually engaged. OPM was aware of and audited transactions where the claims paid amount exceeded the Covered Charges, the same type of "overpayments" as alleged in Relator's Complaint. There was no "ambiguity" to be "disambiguated."

Notwithstanding the plain language of the OPM Audits, the affidavits offered by HealthNow with respect to the OPM Audits were limited in scope. Actually, the affidavits of Kim King and Lisa Burke merely reiterated, and possibly clarified, that "Covered Charges" means what it says.

### C. It was Error to Find that the OPM Audits and Conclusions Are Not Material

The finding in the Report, p. 13, that the OPM Audits make no showing concerning materiality is erroneous. Contrary to the finding, the OPM Audits are clear in showing that contractual improprieties, including non-compliance and overcharges, as determined in the OPM Audits, do not impact upon the Government's payment decisions. This finding falls squarely within the materiality considerations in *Universal Health Servs. v. United States ex rel. Escobar,* 579 U.S. 176, 192 (2016) ("[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act.").

The OPM Audits reviewed FEP transactions, including evidence of overcharges where more than the Covered Charges were paid; made findings with identification of overcharges that were contrary to the FEP contracts, then indicated the Government's response. In no instance did the Government discipline any BCBS Plan. "Since the Government treated the overpayments as mere contractual breaches in the OPM Audits, as opposed to fraud," Report, p. 13, the proper conclusion to be drawn is that the Government does not treat these as material breaches justifying an FCA case.

## POINT III

## THE REPORT ERRED IN DENYING THE MOTION FOR LEAVE TO FILE SUPPLEMENT TO RECORD AND NOT STRIKING THE RELATOR'S AFFIDAVIT

The Report, p. 17, held that "lack of personal knowledge regarding HealthNow's dealings with the federal government does not entitle HealthNow to summary judgment." This conclusion was reached upon the Relator's admissions at deposition that she had no familiarity with many of the allegations in her complaint.

The Magistrate should have rejected the Relator's Opposing Affidavit on the basis that it did not ***affirmatively*** show plaintiff's competency to give evidence concerning the FEP and the OPM Audit. FRCP Rule 56; *Patterson v. County of Oneida*, N.Y., 375 F.3d 206, 219 (2d Cir. 2004); *see also Torrel v. City of New York*, 114 F. App'x 14, 16 (2d Cir. 2004) (finding that because plaintiff failed to provide any basis for her personal knowledge of alleged facts provided in her affidavit in opposition to defendant's motion for summary judgment, her affidavit was not cognizable on summary judgment review and, because she did not cite to any other evidence, affirming the lower court's grant of defendant's motion).

Otherwise, the Motion for Leave to File Supplement to Record should have been received because the Relator's transcript is necessary and probative in the Court's determination of her competency to give evidence on those issues material to the determination of the Motion for Partial Summary Judgment. *Tackman v. Goord*, No. 99–CV–0438A(F), 2005 WL 2347111, *12 (W.D.N.Y. Sept. 26, 2005). Here, in contrast to the statement in the Opposing Affidavit that "the scope [of the OPM Audit] was completely different from my audit," *id.,* Dkt. 97-4, ¶ 13, plaintiff admitted at her deposition that the "sole thing that [she] based her statement on" was a provision in a BCBS response to the 2011 Audit. Deposition of Madelyn Barnes, Sept. 16, 2021 ("Barnes Dep.") 85:22-86:2 (Dkt. 109-2). This admission shows that the basis for her Opposing Affidavit was not her own knowledge, but information she read in the "Association's Response" in the OPM Audit (Dkt. 86-5, p. 11).

The Relator also admitted she had no knowledge of any contract between HealthNow and OPM, Barnes Dep. 72:3-10 (there isn't any), or even if HealthNow negotiates or makes filings with OPM, *id*. 76:14-77:5. Of course, there can be no direct

FCA claim if there is no agreement or submission to the government. While a Relator may be granted some latitude on her claims, Relator's lack of competency to give evidence comes to the fore in her Opposition to the Motion to Supplement, Dkt. 97, where she argued "the OPM Audits were looking for instances where the amount paid exceeded the amount that was allowed by contract [the Allowed Rate]." *Id.* at 2. That statement makes no sense: The "Claim Amount Paid" identifies amount actually paid by HealthNow to the provider and is necessarily less than the Allowed Amount because it is minus co-pays, deductibles, etc.

## CONCLUSION

Accordingly, the Objections should be sustained and the relief sought in the Motion for Partial Summary Judgment and Motion for Leave to File Supplement to Record should be granted in all respects.

Dated: Buffalo, New York
April 4, 2023

PHILLIPS LYTLE LLP

By: *Alan J. Bozer*

Alan J. Bozer
William P. Keefer
Erin C. Borek
Ling Yao
Attorneys for Defendant
*HealthNow New York Inc. etc.*
One Canalside, 125 Main Street
Buffalo, New York 14203-2887
Telephone No. (716) 847-8400